**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**
………………………………..…..……x
Sandra LaPrade, on behalf
of Herself, and Infant Child  LL,                                    **Civil Case No.23-cv-00748**

     Plaintiffs,

v.                                                                                       **COMPLAINT**

Plainfield Board of Education, Plainfield Public
Schools, Plainfield Central Middle School, Scott
Gagnon, Principal (in his individual and official
capacity), Becky Griffin(in her individual and
official capacity), Mary-Jo MacInnis  (in her
individual and official capacity), and Sergeant
Todd Shaw (in his Official and Individual capacity)
City of Plainfield, Plainfield Police Department.                  (Demand for Jury Trial)

     Defendants.
……………………………………………x

     Plaintiff, SANDRA LAPRADE, as the parent and legal guardian of infant Plaintiff L.L.,

by and through her attorneys, THE LAW OFFICES OF TRICIA S. LINDSAY, and for the

following complaint against the Defendants herein, states and alleges as follows:

**PRELIMINARY STATEMENT**

1.    This is a civil action requesting compensatory damages, punitive damages and monetary

relief for the actions of DEFENDANTS PLAINFIELD BOARD OF EDUCATION,

PLAINFIELD PUBLIC SCHOOLS, SCOTT GAGNON, PRINCIPAL, (hereinafter

"GAGNON"), BECKY GRIFFIN (hereinafter "GRIFFIN"), MARY-JO MACINNIS, (hereinafter

"MACINNIS"), DIANA MITCHELL, (hereinafter "MITCHELL"), DISTRICT EMPLOYEES

"JANE AND JOHN DOES 1-10", SERGEANT TODD SHAW (hereinafter "SHAW") (in his

official and individual capacities), and PO "JANE AND JOHN DOES 1-10" (in their individual

and official capacities).

2.    PLAINTIFFS allege that DEFENDANTS, acting individually and collectively, did negligently, wantonly, recklessly, intentionally, and knowingly deprive PLAINTIFFS of rights including, but not limited to, negligent supervision, failure to supervise, failure to protect, and failure to adhere to established policy.

3.    INFANT PLAINTIFF sustained injuries including, but not limited to, negligent infliction of emotional distress, intentional infliction of emotional distress, assault and battery, and false imprisonment.

4.    Specifically, PLAINTIFFS allege that the DEFENDANTS PLAINFIELD PUBLIC SCHOOLS and PLAINFIELD MIDDLE SCHOOL, sitting in *loco parentis*, with regard to its students, failed to prevent the constant bullying, harassment, threats, and intimidation imposed on INFANT PLAINTIFF L.L., and refused to protect L.L. from being placed in fear of harm of for her safety.

5.    DEFENDANTS PLAINFIELD PUBLIC SCHOOL DISTRICT and PLAINFIELD MIDDLE SCHOOL, sitting in *loco parentis*, with regard to its students, failed to prevent the bullying of INFANT PLAINTIFF LL.

6.    DEFENDANTS PLAINFIELD PUBLIC SCHOOL DISTRICT and PLAINFIELD MIDDLE SCHOOL, sitting in *loco parentis* with regard to its students, proliferated a consistent and continuous pattern of violations against INFANT PLAINTIFF LL's civil rights and refused to abide by the DEFENDANTS PLAINFIELD PUBLIC SCHOOL DISTRICT'S rules and policies, which caused INFANT PLAINTIFF LL to be harassed, bullied, and psychologically harmed while in the care, custody and control of DEFENDANTS PLAINFIELD PUBLIC SCHOOL DISTRICT and PLAINFIELD MIDDLE SCHOOL.

7.    INFANT PLAINTIFF LL suffered further psychological and emotional injuries when DEFENDANTS GAGNON, GRIFFIN, MACINNIS, MITCHELL, and SHAW, conspired to and did, falsely imprison her in MACINNIS' office when they made her to sit in the office and refused to allow her to leave with her mother, PLAINTIFF LAPRADE, then told L.L. that her mother may have been in a car accident or was hit by a train.   INFANT PLAINTIFF L.L. suffered further psychological and emotional injuries when DEFENDANTS GAGNON, GRIFFIN, MACINNIS, MITCHELL then sent her home on the bus without notifying any of her emergency contacts, all while knowing that PLAINTIFF LAAPRADE had been arrested based on their false  allegations.

8.    PLAINTIFF SANDRA LAPRADE, as the parent and legal guardian of INFANT PLAINTIFF L.L. suffered psychological injuries, including severe and continuing emotional distress from DEFENDANTS PLAINFIELD PUBLIC SCHOOL DISTRICT and PLAINFIELD MIDDLE SCHOOL's refusal to take the necessary and proper steps required to protect her daughter.  PLAINTIFF LAPRADE suffered further psychological and emotional injuries when DEFENDANTS refused to release her daughter to her, causing her to fear for her daughter's safety, then had her falsely arrested.

9.    Specifically, PLAINTIFFS  allege that DEFENANTS negligently, wantonly, recklessly, intentionally, and knowingly failed to keep INFANT PLAINTIFF safe from being targeted with sexual harassment, threats and bullying in and around the DEFENDANT PLAINFIELD MIDDLE SCHOOL.  PLAINTIFFS LAPRADE and LL allege that DEFENDANTS failed to properly investigate the conduct of the students involved in the bullying incidents,  despite the PLAINIFFS repeated notice to DEFENDANT SCHOOL DISTRICT officials about the situation that marked the toll on INFANT PLAINTIFF'S emotional and psychological state.

10.    DEFENDANTS failed to follow their own established procedures for handling and investigating complaints and for disciplining students involved in the bullying and harassment.

11.    As a result of DEFENDANTS' actions/omissions, PLAINTIFFS  suffered emotional and psychological pain and suffering, loss of privileges and related damages, incurred as a result of the bullying, harassment, and constant attack on INFANT PLAINTIFF.

## JURISDICTION

12.    This action is brought pursuant to 42 U.S.C. §1983 and the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution. Jurisdiction of this Court is invoked under 28 U.S.C. §§ 1331 and 1334.

13.    The Court has supplemental jurisdiction over the Plaintiffs State Law Claims pursuant to 28 U.S.C. § 1367.

14.    Venue in the District of Connecticut is proper pursuant to 28 U.S.C. § 1391, as the cause of action arose in the State of Connecticut.

## PARTIES

15.    PLAINTIFF SANDRA LAPRADE (hereinafter "PLAINTIFF LAPRADE"), is the mother and legal guardian of INFANT PLAINTIFF LL.  PLAINTIFF LAPRADE is a citizen of the United States of America and a resident of the State of Connecticut.

16.    INFANT PLAINTIFF L.L.  is a resident of the State of Connecticut.  INFANT PLAINTIFF L.L. is a student in the Plainfield Public School District.  LL was a minor at the time of the incidents which are at the basis of the claims alleged herein.   At all times relevant to this Complaint, PLAINTIFF L.L. is a citizen of the United States and a student at PLAINFIELD MIDDLE SCHOOL.

17.    DEFENDANT PLAINFIELD BOARD OF EDUCATION oversees the activities and functions of the Plainfield Public School District.

18.    DEFENDANT PLAINFIELD PUBLIC SCHOOLS and DEFENDANT PLAINFIELD CENTRAL MIDDLE SCHOOL are an education corporation and association in the State of Connecticut existing pursuant to Connecticut Education Law.  The school district is a "person" within the meaning of 42 U.S.C. § 1983.  PPS is comprised of several schools including PLAIINFIELD MIDDLE SCHOOL, which exists and operates by virtue of the laws of the State of Connecticut and the United States.  PPS is located I Plainfield, Connecticut and is overseen by DEFENDANT PLAINFIELD BOARD OF EDUCATION.

19.    Defendant SCOTT GAGNON was the Principal of Plainfield Middle School at all times relevant to this Complaint, and as such had a duty of care to oversee the safety, well-being, and security of the students, including INFANT PLAINTIFF L.L..  DEFENDANT GAGNON is being sued here in his individual and official capacity.

20.    DEFENDANT BECKY GRIFFIN was at all times relevant to this Complaint, the Head Secretary at PLAINFIELD MIDDLE SCHOOL, and as such, had a duty of care to oversee the safety and well-being and security of the students including L.L..  DEFENDANT GRIFFIN is being sued here in her individual and official capacity.

21.    DEFENDANT MARY-JO MACINNIS was at all times relevant to this Complaint a Guidance Counselor at PLAINFIELD MIDDLE SCHOOL and as such, had a duty of care to oversee the safety and well-being and security of the students including L.L..  DEFENDANT MACINNIS is being sued here in her individual and official capacity.

22.    DEFENDANT SERGEANT TODD SHAW at all times relevant to this Complaint and upon information and belief, is a Sergeant and is employed with the City of Plainfield under the

direction of the PLAINFIELD POLICE DEPARTMENT, and as such had a duty of care to oversee the safety, well-being, and security of both PLAINTIFFS. DEFENDANT SHAW is being sued here in his individual and official capacity.

23.    DEFENDANT CITY OF PLAINFIELD (hereinafter "CITY") is a duly constituted municipal corporation duly organized and existing under and by virtue of the laws of the State of Connecticut. Upon information and belief, the CITY has direct authority over several different departments including the PLAINFIELD POLICE DEPARTMENT (hereinafter "PPD"). PPD and/or the employees, agents, or representatives of said department are directly involved in violations that are at issue in this Complaint.

24.    The Defendant PLAINFIELD POLICE DEPARTMENT is an agency of the CITY.

## **FACTUAL BACKGROUND**

25.    LL is the minor child of Thomas and Sandra LaPrade. At all times relevant in this Complaint, LL was a 14-year-old child attending DEFENDANT PLAINFIELD CENTRAL MIDDLE SCHOOL.

26.    LL has attention deficit disorder, an ADA recognized disability, and therefore requires a 504 Accommodation Plan to supplement her education. LL also identifies as a lesbian female, as the school and LL's educators are aware of.

27.    LL is an exemplary student who loves to learn. She performs well in academics and her teachers have nothing but kind things to say about her.

28.    Upon information and belief, unfortunately, LL has also been the victim of incessant bullying, sexual harassment, taunts, threats, and intimidation that the defendants are fully aware of, yet have failed to address.

29.     Due to the lack of attentiveness to the issue by the staff, the bullying towards LL began to get severe beginning in or around December of 2020.

30.     Upon information and belief, in or about December 2020, LL reported an incident to guidance counselor Ms. Powell, that another student at lunch was assaulting her by pulling her hair while other students recorded and laughed at the incident.

31.     However, Ms. Powell was ready aware of this situation as she was present at the time of the occurrence and so witnessed the incident.

32.     Upon information and belief, no action was taken in response to this incident.

33.     In or about March of 2021,  LL reported another child known as "John" who, upon information and belief, was sexually harassing LL.

34.     Upon information and belief, John pulled a condom out of his wallet and showed it to LL, while making comments about her appearance, and following her around the school invading her personal space to the point where he was close enough for the two to touch.  LL made multiple attempts to distance herself but was unsuccessful due to his persistence.

35.     Upon information and belief, LL was fearful as she felt intimidated, threatened, and frightened.

36.     On another occasion, also around the same time, or shortly thereafter, this same student, "John" brought a box-cutter to school.  Upon information and belief, LL became aware of it when the box cutter fell out of his backpack during one LL classes where John happens to sit right next to her  LL reported this incident and the next day, she was taken aside to speak with a social worker named "Ms. Kerr", and a school security officer named "Mr. Cloke".

37.  Upon information and belief, during this conversation, LL made Kerr and Cloke aware of the bullying and threats, the sexual harassment, and now the weapon in John's possession.

38.    The school still failed to respond in any appropriate, meaningful, or substantial way.

39.    Upon information and belief, John's behavior continued unchecked, and LL continued to communicate this to school officials as the bullying persisted.  Still, nothing was done.

40.    Upon information and belief, in or about April of 2021, during lunch time while at school, "John" again began directing threats at LL, making sexual comments to her, and calling her a "faggot" multiple time. Not only did LL report this incident and predictably, nothing was done; but what is more disturbing, is that defendant MacInnis was physically present and witnessed this altercation yet again, failed to intervene whatsoever or to even report it.

41.    Scarily, none of the reports made by LL were taken seriously by the staff who were tasked to adhere to certain protocols and procedures for addressing such matters, as required by the District and state and federal law.  This failure on the part of school officials allowed the bullying to continue and to spread to the school community as it became commonplace and acceptable due to the negligence on the part of the staff.  This opened LL up to more bullying by other students who were fully aware of the lack of consequences.

42.    On another occasion, in or about June 8th, 2021, another student named "Lucas" had been relentlessly tormenting LL throughout the day. He would shame LL's appearance and comment on her weight and her sexuality and laugh at her. At this point, LL had nobody around to assist her or that she could rely upon for help, as her  previous complaints to school officials fell on deaf ears and seemed to only make her a bigger target.

43.    LL was in legitimate fear for her safety as she recalled that she had already been a victim of other students who had made inappropriate sexual comments towards her, who showed her a condom and followed her around campus making sexual comments, while using derogatory and hateful slurs referring to her as a "faggot", and even brought weapons to school, and had already

assaulted her physically. More frightening was that "Lucas" upon information and belief, was known to have physically assaulted another female student the prior school year.

44.     At this point LL knew that the school was not going to intervene, so she called her mother to come pick her up from school. LL was in tears and undeniably traumatized as this bullying was non-stop and increasingly aggressive.

45.      After texting her mother to pick her up, upon information and belief, LL was waiting in line to enter a class when a teacher informed her that her mom "was there to pick her up", and that she should go meet her outside.

46.     Feeling a sigh of relief, but anxious to leave, LL immediately exited the line and proceeded towards the front of the school to meet her mom.  LL was so anxious to get to safety that she left her jacket and did not bother to go to retrieve it.  However, LL's efforts to get to safety was thwarted as while she was on her way to meet her mother, DEFENDANT MACINNIS stopped her in the hallway and pulled her into the guidance office, falsely informing LL that her mother was not at the school yet, and she needed to come into her office.  Upon information and belief, LL followed DEFENDANT MAINNIS' instructions and once inside the office DEFENDANT MACINNIS closed the door and the windows to the room and told LL to "stay put".

47.     Upon information and belief, DEFENDANT MACINNIS lied to LL regarding her mother's whereabouts, as PLAINTIFF LAPRADE was in fact, right outside the window where MACINNIS closed the blinds so LL could not see her mother and vice versa.

48.      At one point, LL asked if she could leave the room to get her jacket because she was cold. LL was told that she **could not** leave to get her jacket.

49.     Sometime after that, LL asked if she could use the restroom. Again, she was told that she **could not** leave to use the restroom either.  Thus, LL felt like a prisoner, as she sat in the cold dark

room and at one point, DEFENDANT MITCHELL leaned against the door, blocking LL's ability to leave if she attempted to.

50.     Upon information and belief, LL was kept in the guidance office, against her will, and not allowed to leave under any conditions other than with permission from school officials even though her mother was standing directly outside waiting to pick her up the entire time.

51.     LL was cold, scared, had to use the restroom. She had no clue where her mother was, and she was being forced to stay in a room against her will like a prisoner, with the door shut and the blinds closed by the very same people who had failed multiple times to protect her or to even address her very serious concerns.

52.     Upon information and belief, during this time, the student bully was still in class with other students as if he had done nothing wrong while LL was being imprisoned by administrators in the guidance office and not released to her mother.

53.     Upon information and belief, all the while LL was being imprisoned and further traumatized by the exact people who have both a moral and legal responsibility to intervene in the way she is being treated, her mother was outside trying desperately to get the school to release LL.

54.     When Ms. LaPrade first arrived to pick up LL, she was approached by Becky Griffin who asked her why she was there. Ms. Laprade responded stating she was there to pick up LL. Griffin again asked why, and Ms. LaPrade repeated her answer. Still not seeming to understand, Griffin asked a third time why Ms. LaPrade was there. When Ms. LaPrade again stated she was there to pick up LL, Griffin simply went inside the school. At this time Ms. LaPrade dialed 911 for assistance in getting her daughter out of the school.

55.    The first officer to arrive was Officer_____, who Ms. LaPrade had previously interacted with and was comfortable with. Officer ___ was able to calm Ms. LaPrade, who was admittedly and justifiably emotional and upset at this point.

56.    The second officer to arrive was Sergeant Todd Shaw. Shaw approached Ms. LaPrade and informed her that he was going inside to retrieve LL. After he went inside, Principal Scott Gagnon came outside and attempted to speak to Ms. LaPrade, yet still would not produce LL.

57.    The next thing to happen, inexplicably, was Sergeant Shaw came out of the school, approached Ms. LaPrade's car, grabbed her by the arm with far more force than necessary, pulled her out of the car, and placed her under arrest for "breaching the peace". LL was still being imprisoned at the school.

58.    Ms. LaPrade was arrested and taken to Plainfield PD for booking. At this point LL was asking about her mother and becoming increasingly concerned.

59.    When asked where her mother was, MacInnis responded to LL that "maybe she got into a car accident", or "maybe there was a train accident". Despite knowing that Ms. Laprade was in eye distance of LL the whole time, and was then arrested, MacInnis inferred to LL that her mother could be dead or seriously injured. This was a gross infliction of distress on LL that served no purpose and was intentional.

60.    The school made no attempts to contact LL's emergency contact. Instead, they sent a traumatized and disabled minor child, into whom they just instilled fear that her mother was hurt or dead, and who just spent the entire day being bullied, harassed, and then imprisoned, home alone on the school bus with no idea as to where her mother was or if she was okay. They knew her mother had been arrested and that LL would have no way of contacting her through the phone either.

61.    Nobody at PMS ever offered any additional support or resources to LL at any time related to the bullying.

62.    PMS instead held a meeting with LL and her bully without notifying Ms. Laprade. Needless to say, this meeting did nothing but further traumatize LL and should have never happened, especially without any parental consent or knowledge.

63.    To top it all off, after the incident on June 8th, the defendants knowingly filed a false report with Connecticut DCF against LaPrade's, just to add insult to injury. This report was a transparent attempt to justify their illicit and unlawful actions that day and was immediately dismissed and unsubstantiated by DCF.

64.    The bullying experienced by LL has been pervasive, traumatizing, and completely ignored by the defendants. The defendants have violated State Law, their own policies, and statutorily mandated guidelines for addressing bullying in their schools.

65.    The defendants at PPS have turned a blind eye to the incessant bullying at PMS. They refuse to provide Ms. Laprade with their anti-bullying polices and guidelines and have failed to follow multiple state mandates related to bullying and harassment. The defendants have also failed to intervene while LL was sexually harassed and threatened on the basis of her gender and sexuality.

66.    The defendants at PPS have failed to protect LL, failed to provide a safe learning climate, have facilitated the bullying and harassment of LL, and then turned Ms. LaPrade into the villain, despite doing nothing but trying to protect her daughter where they had failed miserably. LL's health and safety were at imminent risk, and the defendants still failed to act. Instead, they perpetuated the trauma while ignoring the threats and imminent risk to LL's physical safety and emotional well-being.

## IV. CLAIMS

### CLAIM ONE
Title IX Gender Discrimination
(Against Plainfield Public Schools, Plainfield BOE)

67.    Plaintiffs reiterate lines 1-66 as if fully incorporated.

68.    It is well settled that students have a right, under Title IX, to be free from peer-to-peer sexual harassment and damages can lie against a school system in cases of student-to-student sexual harassment where the school acts with deliberate indifference to known acts of harassment" *Riccio ex rel. Andree v. New Haven Bd. of Educ.*, 467 F. Supp. 2d 219, 224 (D. Conn. 2006).

69.    The Plainfield Board of Education and the Plainfield Public Schools have a responsibility under Title IX to address and prevent student to student sexual harassment.

70.    Plainfield Middle Schools did nothing to address or prevent the sexual harassment of LL, which was so pervasive and severe that she could no longer attend her classes without feeling unsafe and threatened and was denied equal access to her education.

71.    Defendant MacInnis was physically present during one incident of bullying where LL was actually assaulted, and did not intervene, report it to anybody, discuss it with Ms. Laprade, or attempt in any way to assist LL.

72.    LL has been targeted for her gender with other students making comments about her appearance, her height and weight, and her sexual identity. Not only has LL been physically assaulted, but she has also been subjected to verbal assaults, including being called the most derogatory term, a "faggot".

73.     LL has also been sexually harassed by a student who showed her a condom he had brought to school and proceeded to follow her at a close distance when she walked around the hallways in an effort to physically intimidate her.

74.     Principal Scott Gagnon and Mary-Jo MacInnis were both aware of these incidents and the ongoing bullying and threats directed at LL, from both personally witnessing them and from LL and Ms. LaPrade consistently bringing it to their attention in meetings with educators and public board meetings. Ms. LaPrade also wrote a letter asking the superintendent to address the bullying at Plainfield Public Schools. She never received a response.

75.     Plainfield Public Schools and the Plainfield BOE have tolerated and failed to cure an abhorrent pattern of sexual harassment and bullying against LL based on her gender and sexual identity.

**CLAIM TWO**
42 U.S.C §1983 – Negligent Hiring, Retention, and Supervision
(Against Plainfield BOE and Plainfield Public Schools)

76.     Plaintiffs reiterate lines 1-75 as if fully incorporated herein.

77.     Public Act 11-232 dictates and mandates numerous procedures that the school districts in the State of Connecticut are required to adopt and implement.

78.     Such procedures include, but are not limited to:

§10-220(a)(5)(a): Each local or regional board of education shall provide an in-service training program for its teachers, administrators and pupil personnel who hold the initial educator, provisional educator or professional educator certificate.

§10-220(a)(9)(c)(1): For the school year commencing July 1, 2012, and each school year thereafter, the principal of each school shall establish a committee or designate at least one existing committee in the school to be responsible for developing and fostering a safe school climate and addressing issues relating to bullying in the school. Such committee

shall include at least one parent or guardian of a student enrolled in the school appointed by the school principal.

**§10-220(a)(9)(c)(2):** Any such committee shall: (A) receive copies of completed reports following investigations of bullying, (B) identify and address patterns of bullying among students in the school, (C) review and amend school policies relating to bullying, (D) review and make recommendations to the district safe school climate coordinator regarding the district's safe school climate plan based on issues and experiences specific to the school, (E) educate students, school employees and parents and guardians of students on issues relating to bullying, (F) collaborate with the district safe school climate coordinator in the collection of data regarding bullying, in accordance with the provisions of subsection (b) of section 10-222d of the general statutes, as amended by this act, and subsection (a) of section 10-222h of the general statutes, as amended by this act, and (G) perform any other duties as determined by the school principal that are related to the prevention, identification and response to school bullying for the school.

79.     While Plainfield Public Schools and the BOE may have an anti-bullying policy and/or a safe school climate plan, they are not reporting, investigating, or responding whatsoever to incidents of LL's bullying in any accordance with such.

80.     The circumstances surrounding LL's bullying made it obvious to both PPS, and the BOE that failure to act would subject LL to imminent harm. LL was physically assaulted, sexually harassed, as well as threatened and stalked around the hallways by a boy who was known to have brought weapons to school and harassed by another boy who had previously assaulted another female student.

81.     Both PPS and the BOE failed to train and or supervise their employees in the adoption and implementation of state mandated anti-bullying procedures.

82.     PPS was put on notice of the existence of a hostile educational environment for LL was created by the peer-on-peer sexual harassment being leveled against her and they did not respond in any meaningful way. Instead, they showed deliberate indifference to both state law and BOE policy, and the BOE did nothing to address this indifference. They allowed PPS and their employees to continue operating without enforcing a school safe climate plan and failed to train

and supervise their employees to act in accordance with State Law as it relates to anti-bullying legislation.

## CLAIM THREE
Intentional Infliction of Emotional Distress
(Against Scott Gagnon, Becky Griffin, and Mary-Jo MacInnis)

83.    Plaintiff reiterates lines 1-82 as if fully incorporated herein.

84.    On June 8th, 2020, the above-named defendants placed LL into a room, closed the door, shut the blinds, and would not allow her to leave under any circumstances, including to use the bathroom. LL, at the time, was a 14-year-old child, suffering from a disability, who was being incessantly bullied to the point of causing extreme distress and trauma. LL was held in this room for nearly an hour.

85.    With her mother standing right outside the window which the defendants intentionally blocked her view out of, MacInnis told LL that her mother may be seriously injured or even dead.

86.    Gagnon and Griffin both facilitated and assisted MacInnis in imprisoning LL in the room while they lied about the location of mother. All three defendants collectively made the decision not to let LL out of the room or to release her to her mother.

87.    These defendants knew or should have known that their conduct would cause LL extreme distress, and it did. LL was placed on a bus by the defendants and sent home after they had her mother arrested in front of the school, without telling LL anything about where her mother was. The toll that this incident took on LL was massive, considering the amount of distress she was already under before the defendants imprisoned her in a room with her mother waiting outside to pick her up.

## CLAIM FOUR
### Negligent Infliction of Emotional Distress
(Against Scott Gagnon, Becky Griffin, and Mary-Jo MacInnis)

88.    Plaintiff reiterates lines 1-87 as if fully incorporated herein.

89.    The defendants conduct, as detailed above in Count Three, created an unreasonable risk of causing emotional distress to LL. LL was already vulnerable and traumatized, and imprisoning her in a room when all she wanted was to be released to her mother, while not allowing her to leave the room at all, is certainly a situation that would foreseeably cause emotional distress.

90.    The above-named defendants knew, or should have known, that their actions would damage the mental health and emotional well-being of LL. There was no justification  for keeping LL in that room for nearly an hour against her will.

## COUNT FIVE
### False Imprisonment
(Against Scott Gagnon, Becky Griffin, Mary-Jo MacInnis, and Todd Shaw)

91.    Plaintiff reiterates lines 1-90 as if fully incorporated herein.

92.    The above-named defendants restrained the physical liberties of LL by keeping her in a room with the blinds closed and not allowing her to leave for any reason.

93.    Shaw contributed to this false imprisonment by validating and facilitating it when he arrested Ms. LaPrade rather than release LL to her custody. Shaw had the opportunity and authority to release LL but did not. It was in fact Ms. LaPrade who called 911 for assistance.

94.    At no point did LL consent to being kept in that office and she in fact asked multiple times to leave but was denied every time.

**COUNT SIX**
Civil Conspiracy
(Against Scott Gagnon, Becky Griffin, Mary-Jo MacInnis, and Todd Shaw)

95.    Plaintiff reiterates lines 1-94 as if fully incorporated herein.

96.    The above-named defendants all conspired to keep LL imprisoned against her will by way of having Ms. LaPrade arrested.

97.    Shaw showed up at the scene on June 8th, 2020, as the second officer to arrive. He approached Ms. LaPrade, took a statement, and then went inside the school to discuss the situation with Gagnon, MacInnis, and Griffin, whom Shaw refers to as "Becky".

98.    Shaw and Griffin are on a first name basis and are friends. Griffin's daughter is a close colleague of Shaw.

99.    All four parties were involved in the decision to arrest Ms. LaPrade and keep LL in the office against her will. This decision also resulted in LL's safety being threatened as the parties chose to send her home alone on the school bus with no idea what happened to her mother. The parties' objective was to have Ms. LaPrade arrested so that LL could not be with her mother and instead had to remain in the office to be released when the defendants decided they wanted to, and not to her mother who she absolutely needed in that moment.

**COUNT SEVEN**
Negligence/Gross Negligence
(Against All Defendants)

100.    Plaintiff reiterates lines 1-99 as if fully incorporated herein.

101.    The defendants all had a duty to care for LL as her educators and a duty to protect her from the bullying and harassment she complained of. This duty is codified in CGS Title 10

102.    The defendant's duty to LL is amplified and increased on account of her disability and her status as a lesbian, which the school is aware of, and which is a protected class under Title IX and ADA.

103.    The defendants all neglected to take any steps to use due care for the particular benefit of disabled and lesbian students, particularly LL.

104.    The defendants' failure and neglect to adopt the polices and mandates of Title 10, failure to apply due care to LL's particular circumstances and unique needs, and failure to intervene in the bullying and threats targeted at her were grossly negligent acts which indicate a deliberate indifference and reckless disregard for the rights of LL.

### COUNT NINE
Excessive Force
(Against Todd Shaw)

105.    Plaintiff reiterates lines 1-104 as if fully incorporated herein.

106.    On June 8th, 2020, Sergeant Shaw arrested Ms. LaPrade in front of PMS while she was trying to retrieve her daughter who was being bullied and then held against her will inside the school. He charged her "breaching the peace" and "resisting arrest".

107.    Ms. LaPrade pled no contest to the charges so she could put the incident behind her and focus on her daughter.

108.    The decision to arrest Ms. LaPrade was outrageous and unnecessary to begin with. Sergeant Shaw also had no reason to grab Ms. Laprade and physically pull her from her vehicle.

109.    This unnecessary use of force caused large and painful bruising on the arm of Ms. Laprade.

## CLAIM TEN
Municipal Liability
(Against Plainfield Public Schools and Plainfield BOE)

110.    Plaintiff reiterates lines 1-109 as if fully incorporated herein.

111.    Both PPS and the BOE have demonstrated deliberate indifference to State Law and in the face of misconduct that is persistent and pervasive over time.

112.    Evidence of deliberate indifference can be drawn from the defendants' lack of any response to the plaintiffs' numerous complaints of bullying and threats and their failure to train and supervise their employees and educators in proper mandated anti-bullying procedures. The defendants lack of response placed LL at imminent risk of being seriously physically injured and emotionally tormented.

113.    The defendants have taken no action to protect the rights and the safe educational climate LL is entitled to.

## CLAIM ELEVEN
Punitive Damages
(Against all Defendants)

114.    Plaintiff reiterates lines 1-113 as if fully incorporated herein.

115.    Punitive damages are appropriate in this case against all defendants. Each of the defendants acted in gross disregard for the Plaintiffs' rights.

116.    The defendants, by imprisoning LL and conspiring to do so, by failing to adopt and implement anti-bullying procedures as mandated by law, and by failing to intervene agaisnt the bullying and sexual harassment of LL, have demonstrated the precise type of malice and reckless disregard that punitive damages are intended to address.

## CLAIM TWELVE
Injunctive Relief
(Against Plainfield Public Schools and Plainfield BOE)

117.    Plaintiffs reiterate lines 1-116 as if fully incorporated herein.

118.    Plaintiffs in this action seek injunctive relief requiring the above-named defendants to immediately adopt and implement a safe school climate plan in accordance with state law, and to enforce it.

119.    Plaintiffs also seek injunctive relief requiring that the defendants train and supervise their employees in accordance with CGS Title 10.

120.    As there is no other adequate remedy available, and LL and many other students stand to be irreparably harmed by the defendants' negligence, injunctive relief is necessary and justifiable.


WHEREFORE, Plaintiffs seek the following relief from the court:

1.  Injunctive relief pursuant to paragraphs 117-120 of the foregoing complaint,

2.  Compensatory and Punitive Damages to be determined at trial, and,

3.  Any other relief this court deems necessary and just.


Dated: June 8th, 2020.


/s/ _Tricia Lindsay_

Tricia S. Lindsay, Esq.